UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------X
FRANK RIVERA,

                 Petitioner,      <u>MEMORANDUM AND ORDER</u>
                                     CV-03-4198
       -against-

JOSEPH SMITH, SUPERINTENDENT

                 Respondent.
-----------------------------X
A P P E A R A N C E S:

For Petitioner:
    Frank Rivera, <u>Pro Se</u>
    # 99A3146
    Eastern N.Y. Correctional Facility
    Box 338
    Napanoch, New York 12458-0338

For Respondent:
    Margaret E. Mainusch
    Nassau County District Attorney's Office
    262 Old Country Road
    Mineola, New York 11501

HURLEY, Senior District Judge

       Frankie Rivera ("Rivera" or "petitioner"), proceeding

<u>pro se</u>, petitions this Court for a writ of habeas corpus,

pursuant to 28 U.S.C. § 2254, vacating his conviction entered on

January 6, 1999 in the County Court in the State of New York,

County of Nassau (the "trial court") for depraved indifference

murder in the second degree in violation of New York Penal Law §

125.25(2), and for two counts of tampering with physical evidence

under New York Penal Law § 215.40(2).

       Petitioner was sentence to an indeterminate term of

twenty-five years to life imprisonment on the murder conviction

and concurrent indeterminate terms of one and one third to four years imprisonment on the two evidence tampering convictions. His conviction and sentence were affirmed on appeal by the Appellate Division, Second Department (People v. Rivera, 288 A.D.2d 402 (2d Dep't 2001)), and his application for leave to appeal to the New York Court of Appeals was denied on March 22, 2002.  People v. Rivera, 97 N.Y.2d 760 (2002).

Petitioner seeks habeas relief on four listed grounds, to wit: (1) the prosecution committed Brady violations by (a) deliberately delaying disclosure of the grand jury of testimony of Eric Outlaw, and (b) failing to disclose that Peter Gonzalez purportedly provided false information to the grand jury which he later recanted prior to trial concerning petitioner sodomizing the murder victim; (2) petitioner was denied his constitutional right to the effective assistance of counsel; (3) the jury's verdict was against the weight of the evidence, and (4) the sentence imposed was excessive.[1]

## I. BACKGROUND

During the evening hours of November 26, 1997, petitioner, who was with his girlfriend Thomassina McKenna

---

[1]  Petitioner set forth five grounds in his petition.  Pet. at 5 and 6.  But two of those grounds charge Brady violations, viz. his grounds "one" and "four."  Id.  As a result, I will treat those two claims as one – addressed under the shared caption "CHARGED BRADY VIOLATIONS" –, thereby reducing the listing of his grounds from five to four.

("McKenna") at the Jolt Bar in Freeport, Nassau County became aggravated when Michael Demetres ("Demetres or "Eggy") continually stared at them.[2]  Trial Transcript ("Tr.") at 505-06. Petitioner eventually paid another bar patron $10.00 to take Demetres outside and "smack him up."  Id. at 506, 514; see also id. at 919-20.  When that exercise failed to stop the staring, petitioner offered to pay Bryan Medina ("Medina") $250.00 or an "eight-ball" of cocaine[3] to stab Demetres towards the same end. Id. at 508, 517-18, 934-35.  Medina accepted the offer, whereupon Medina and petitioner confronted Demetres immediately outside the bar.  Petitioner hit Demetres "at least twice" with a large branch while Demetres was restrained by Medina, and then watched as Medina proceeded, pursuant to his agreement with the petitioner, to stab Demetres multiple times.[4]  Id. at 509. Afterwards, petitioner discarded the post-assault pieces of the branch in a nearby dumpster.  Id. at 533-34.  The knife used to stab Demetres was thrown into a sewer.  Id. at 535.  Medina was

---

[2]  McKenna "live[d] with [Demetres and his family for] [r]oughly two years on and off. . . ." Tr. at 902, considerably before she "started to live" with Rivera.  Id. at 904.  It was McKenna's understanding that Demetres "was always in love with [her]." Id. at 877.  She believed he was "jealous," id., thus possibly triggering his attention to the couple on November 26, 1997.

[3]  As explained by McKenna, "an eight-ball" consists of "[t]hree and-a-half grams of cocaine."  Tr. at 935.

[4]  Petitioner has consistently maintained that he did not expect the stabbing to be fatal to the victim.

paid $120 of the agreed-upon $250 that night with Rivera promising to pay the remainder the next day. Id. at 889-90; see also id. at 523-24. Later petitioner told his girlfriend and Peter Gonzalez ("Gonzalez") that he and Medina had each "fucked" Demetres. Id. at 859.

When Demetres's body was found outside the bar, "his pants were down below his knees." Id. at 159. Swabs were taken during the autopsy which, when analyzed, disclosed the presence of sperm on or about his anal cavity. Id. at 418-427.[5]

Petitioner and Medina were thereafter arrested and charged alternatively with intentional murder and depraved indifference murder under subdivisions (1) and (2) of N.Y. P. L. § 125.25, together with two counts of tampering with physical evidence – viz. the stick used by petitioner to beat Demetres and the knife used by Medina to stab him — in violation of N.Y. P. L. § 215.40(2). In addition, petitioner "was further charged alone with one additional count of murder in the second degree (N.Y. P. L. § 125.25(3))(felony murder) and sodomy in the first degree (N.Y. P. L. § 130.50(1))(the underlying felony."). Resp't Aff. & Mem. of Law (DE 14) at iii, ¶ 8.

A joint suppression hearing was held in September 1998. Among other things, the hearing court determined that certain

---

[5]  It was later agreed, based on a DNA analysis, that the subject sperm was the victim's. See Tr. at 972; see generally id. at 345.

inculpatory statements made by the petitioner and Medina to Nassau County homicide detectives were knowingly, intelligently, and voluntarily made following their receipt of their <u>Miranda</u> rights and, accordingly, were admissible. The case against Medina and petitioner was then severed for trial purposes.

On December 7, 1998 Medina pled guilty to depraved indifference murder in satisfaction of the charges against him and received a sentence of twenty years to life imprisonment.

## II. <u>PROCEDURAL HISTORY OF THE CASE AS TO PRESENT PETITION</u>

Rivera's petition seeking habeas relief was filed on August 20, 2003. By order filed on August 3, 2004, the petition was administratively closed due to the petitioner's failure to exhaust available state remedies. That closure was vacated on February 5, 2013 based on petitioner notifying the Court on October 10, 2012 that he had pursued, albeit unsuccessfully, the prior unexhausted claims. As a result, it is agreed that petitioner's application is both timely and ripe for review.

## III. <u>DISCUSSION OF GROUNDS ADVANCED IN SEEKING HABEAS RELIEF</u>

The four grounds advanced by petitioner, as previously identified, will now be addressed seriatim.

### A. <u>CHARGED BRADY VIOLATIONS</u>

In <u>Brady v. Maryland</u>, the Supreme Court held that "suppression by the prosecution of evidence favorable to an accused . . . violates due process when the evidence is material

either to guilt or to punishment irrespective of the good faith or bad faith of the prosecution." Brady v. Maryland, 373 U.S. 83, 87 (1963). To state a viable Brady claim, a petitioner must establish that the information was favorable to the accused, was suppressed by the prosecution, and that prejudice ensued. Strickler v. Greene, 527 U.S. 263, 281 (1999). "Evidence is not 'suppressed' if the defendant either knew, . . . or should have known, . . . of the essential facts permitting him to take advantage of [the] exculpatory evidence.'" United States v. LeRoy, 687 F.2d 610, 618 (2d Cir. 1982)(citations omitted).

Petitioner claims two Brady violations, viz. that the "Prosecutor violated [his] constitutional rights when he failed to [timely] disclose Eric Outlaw's grand jury testimony" (Pet'r's Reply & Mem. of Law (DE 10) at i,) and by "fail[ing] to reveal" that Gonzalez informed the prosecutor prior to trial that the written statement he had given to the police, as well as his corresponding grand jury testimony, was inaccurate to the extent he had reported that Rivera told him that he had "fucked Eggy in the ass" rather than that "[h]e and Medina had fucked Eggy up." Id. at 3-4.

### 1.  Eric Outlaw ("Outlaw")

#### (a) Petitioner's Position

Outlaw was a bouncer at the Jolt Bar. Petitioner proffers that immediately after the stabbing, he ran back into

the bar and "only spoke to Eric Outlaw" who "was the only person who could properly relate to the jury petitioner's state of being at that moment . . . ." Id. at 11.

Although the Court has not been provided with Outlaw's grand jury testimony, petitioner states, and I accept for present purposes, that Outlaw told the grand jury that petitioner "upon entering the bar, expressed shock and disbelief that Brian Medina had stabbed Demetres." Pet. (DE 1) at 17. Citing People v. Brown, 80 N.Y.2d 729 (1993) for the proposition that such testimony would have been admissible as a "present sense impression," petitioner maintains Outlaw's observations were pivotal to the defense as tending to dispel the harm done by the prosecutor's statement during his opening to the effect that petitioner sodomized a dying man, as well as to demonstrate that he "did not share the same mind-set as the killer." Pet'r's Reply & Mem. Law (DE 10) at 11-12. The delayed disclosure, it is argued, precluded its effective use by the defense thereby running afoul of Brady.

> (b) Respondent's Position That Claim is
> Procedurally Defaulted as not Adequately
> Raised by Petitioner in State Courts

Respondent attacks this Brady claim or several fronts, including that it is procedurally barred. Section 2254(b)(1) provides in pertinent part that "[a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the

judgment of a State court shall not be granted unless it appears
that . . . the applicant has exhausted the remedies available in
the courts of the State. . . ."  28 U.S.C. § 2254(b)(1)(A).
Here, that means that Rivera's complaints should have been
broached not only at the trial level, but also in all available
state appellate tribunals as well.  <u>Klein v. Harris</u>, 667 F.2d
274, 282 (2d Cir. 1981).  Although petitioner's Outlaw-based
<u>Brady</u> claim was raised as part of his unsuccessful appeal to the
Appellate Division (<u>see</u> Def.'s App. Div. Br. at 12, 23-25), it
was not presented to the state's highest court.[6]  <u>See</u> Jan. 15,
2002 Letter of Pet'r's then Attorney, Virginia Boccio, Esq., to
the Chief of the Court of Appeals seeking leave to appeal.  Under
the circumstances, the Court will deem the claim to be exhausted
in that there are no further state remedies available.  <u>See</u>
<u>Coleman v. Thompson</u>, 501 U.S. 722,732 (1991)("A habeas petitioner
who has defaulted on his federal claims in state court meets the
technical requirements for exhaustion; there are no state
remedies any longer 'available' to him.");  <u>Spence v.</u>

---

[6] Petitioner may not endeavor to cure the above referenced
deficiency now for New York C.P.L. § 460.30(1) precludes
successive leave applications to the Court of Appeals.  Moreover,
review via New York C.P.L. § 440.10 is not available because the
Outlaw scenario was raised in detail on the record during the
trial.  See New York C.P.L § 440.12(2),(3); <u>People v. Cooks</u>, 67
N.Y.2d 100, 103-04 (1986)(a motion to vacate a conviction under
New York C.P.L. § 440.10 is only available for those cases where
sufficient facts do not appear in the record to permit direct
appellate review).

<u>Superintendent</u>, 219 F.3d 162, 170 (2d Cir. 2000) (claim deemed exhausted where petitioner did not raise it on direct appeal in state courts and could not obtain collateral review pursuant to N.Y.C.P.L. § 440.10); <u>Grey v. Hoke</u>, 933 F.2d 117, 120 (2d Cir. 1991) (claim not raised in leave application to Court of Appeals was procedurally barred because petitioner had already made the one leave request to which he was entitled).

> (c) Petitioner has not Demonstrated Cause
> for the Default and Resulting Prejudice,
> or That the Failure to Address Claim
> on the Merits Will Bring About a
> <u>Fundamental Miscarriage of Justice</u>

In cases, such as here, in which the claim is deemed exhausted, "federal habeas review is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." <u>Coleman v. Thompson</u>, 501 U.S. at 750. Petitioner has not advanced any reason for his failure to request the Court of Appeals to consider the <u>Brady</u> claim under discussion, nor has he been able to convincingly articulate "actual prejudice as a result of the alleged violation of federal law" because, as explained <u>infra</u>, the claim is devoid of merit.

Similarly, petitioner is not in a position to demonstrate that this Court's refusal to review this procedurally barred claim would result in a "fundamental miscarriage of

justice" in the sense that the charged "constitutional violation
has probably caused the conviction of an innocent person."
Murray v. Carrier, 477 U.S. 478, 495-96 (1986); see also Lebron
v. Mann, 40 F.3d 561, 564 (2d Cir. 1994).  Abundant evidence was
before the jury, including petitioner's statements to law
enforcement, that he hired Medina to stab Demetres.  Indeed, as
respondent correctly underscores: "Petitioner has never denied
that he asked Bryan Medina to stab Michael Demetres or that he
offered to pay Medina for his services. . . .  Petitioner simply
insists that he never intended for Medina to kill Demetres and,
therefore, he is not guilty of causing that death."  Resp't's
Aff. & Mem. of Law (DE 14) at 28.  But intent to kill is not an
element of deprived indifference murder.  Mannix v. Phillips, 619
F.3d 187, 193 (2d Cir. 2010)("Although this charge [under N.Y.
Penal Law § 125.25(2)] is called murder, it does not require
proof of defendant's intent to kill . . . .") and People v.
Craft, 36 A.D.3d 1145, 1147 (3d Dep't 2007)("Depraved
indifference murder involves an unintentional killing where the
defendant's conduct is so wanton, so deficient in a moral sense
of concern, so devoid of regard of the life or lives of others,
and so blameworthy as to warrant the same criminal liability as
that which the law imposes upon a person who intentionally causes
the death of another")(quotation marks and citation omitted).
Clearly, petitioner has failed to meet the actual innocense

standard.

In sum, petitioner's Outlaw-based <u>Brady</u> claim is procedurally barred. But even if, <u>arguendo</u>, such was not the case, a denial of the relief sought on the merits would be required as next discussed.

> (d) Not Only is the Outlaw-based <u>Brady</u>
> Claim Procedurally Barred, but it
> <u>Also Fails if Addressed  on the Merits</u>

By way of background, the prosecutor provided defense counsel with Outlaw's grand jury testimony at the conclusion of jury selection pursuant to New York C.P.L. § 240.45 based on his then intention to call Outlaw as a witness for the People. Although Outlaw never did testify, the essence of his grand jury testimony, as proffered by Rivera, was elicited by defense counsel during his cross-examination of another witness and underscored for the jury during the defense's summation. Thus Jolt bartender Heidi Howes ("Howes") testified at trial that petitioner looked "stunned," "like he had seen a ghost" and was "speechless" upon re-entering the bar immediately after the stabbing. Tr. at 453-54; <u>see also</u> defense counsel's summation, <u>id.</u> at 1017.[7]

---

[7] Petitioner maintains that had the Outlaw's grand jury testimony been furnished earlier, he could have made arrangements for him to testify as a defense witness. But whether Outlaw would have been a better witness than Howes as to this point is problematic. <u>See</u> Feb. 13, 2003 letter of defense counsel, Adrian L. DiLuzio, Esq., to petitioner (DE 27), explaining that, in his judgment, it was preferable to have testimony about his demeanor

Not only was the cited gap in the proof supposedly caused by Outlaw's absence at the trial basically cured by Howes's testimony, but, to step-back for a moment, Rivera has not even established that his use of the term "Brady" in the present context is appropriate.  As explained by the Appellate Division, Second Department in affirming his conviction:

> We reject the defendant's contention that he is entitled to a new trial because the People failed to timely produce Brady material.  The purported Brady evidence was not material to the issue of the defendant's guilt.  In any event, there is no reasonable probability that the result would have been different had the evidence been disclosed. People v. Rivera, 288 A.D.2d 402 (2d Dep't 2001)(citations omitted).

That determination by the Appellate Division may not be disturbed via the granting of the requested writ unless the State's adjudication of the claim

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Proceeding in reverse order, i.e. considering

_____

upon re-entering the bar given by someone like Howes who, unlike Outlaw, did not have warrants outstanding for her arrest and police officers "looking for [her]." Id. at unnumbered page 2.

subdivision (d)(2) of § 2254 initially, petitioner does not argue
that the State's rejection of his Outlaw-based Brady claim is
traceable to "an unreasonable determination of the facts in light
of the evidence presented."  And, as to subdivision (d)(1),
nothing has been proffered by petitioner to suggest, no less
establish, that the Appellate Division's decision on this point
is at odds with "clearly established Federal law . . . as
determined by the Supreme Court of the United States."  28 U.S.C.
§ 2254)d)(1).

Additionally, the Appellate Division's conclusion that
the "purported Brady evidence was not material to the issue of
defendant's guilt" is sound in that under the depraved
indifference murder count the People were not, as noted earlier,
required to prove that the petitioner intended for his hired
assailant to kill the victim.  Instead, the prosecution was
required to demonstrate that Rivera "under circumstances evincing
a depraved indifference to human life . . . recklessly engage[d]
in conduct which created a grave risk of death to another person,
and thereby cause[d] the death of another person."  N.Y. Penal
Law § 125.25(2).  The focus in such prosecutions is "on an
objective assessment of the degree of risk presented by [the]
defendant's reckless conduct, not upon his subjective intent . .
. ."  People v. Fink, 251 A.D.2d 751, 752 (3d Dep't
1998)(citation omitted).  As a result, Outlaw's proffered

-13-

testimony, had he been called to the stand, would have been not only cumulative of Howes's, but also of questionable relevance to the depraved indifference count of the indictment.

By way of conclusion, petitioner's Outlaw-based <u>Brady</u> claim falls short of the mark for several reasons including (1) the claim is procedurally barred, and (2) even if evaluated on its merits, the targeted information is not "material" for <u>Brady</u> purposes as correctly concluded by the Appellate Division consistent with clearly established federal law.

## 2. <u>Peter Gonzalez ("Gonzalez")</u>

Petitioner maintains that Gonzalez told the prosecution before the trial started that a portion of his grand testimony was incorrect.

By way of background, Gonzalez told members of law enforcement that after he had beaten Demetres with a tree branch and Medina had stabbed the victim, "they pulled down his pants and [that]. . Bryan fucked him . . . in the ass . . . . and when Bryan was done, he [also] fucked him in the ass" and signed a written statement so indicating. <u>See</u> second document included within Ex. C to Pet'r's May 21, 2012 Supplemental Submission (DE 27 at p. 14).

On October 15, 1998, Private Investigator Richard J. Mercy conducted a tape-recorded interview of Gonzalez while acting on defense counsel DeLuzio's behalf. <u>See</u> first document

included within Ex. C, id.  The primary focus of that interview concerned what petitioner said to Gonzalez about sodomizing Demetres.  Although Gonzalez's comments are less than a seamless web of consistency, he does disavow during the interview the portion of his earlier written statement reporting that petitioner told him specifically that he "fucked (the victim) in the ass."  The following excerpts from the interview are germane:

> **Peter:**[8] . . . I said, he had fucked him, and I never said he had fucked him in the ass. That's what the statement says, that he had fucked him in the ass.  He said he fucked him, now fuck could be you beat him up or. .
>
> **Mercy:** This is what, ah, this is what Frankie, Cheeze told you, that he said I fucked ["him"]?
>
> **Peter:** Yeah, but he didn't.  I never, that's why I told the D.A. that, that I never said, No, I didn't say that he fucked him in the ass.  I know he said fucked him, that word. That is my word.
>
> **Mercy:** Okay, okay, but that's all, but you made a statement here that's a little more explicit.
>
> **Peter:** Yeah, that ah, that's what I told the D.A. and the D.A. was like, well ah, you said he fucked him in the ass.  I said he fucked him, so basically he fucked him in the ass or he fucked him up.  One of those two, you know what I am saying?  I don't know I am just saying what he told me.
>
> **Mercy:** What Frankie told you?
>
> **Peter:** Yeah.

---

[8]  As noted earlier, Gonzalez's first name is "Peter."

. . . .

> **Mercy:** Cheeze [i.e. petitioner] said, when
> Bryan was done he fucked him in the ass, So
> what you're saying here [in the written
> statement] is he said, when Bryan was through
> fucking him, then um ah.
>
> **Peter:** He said he fucked him. He didn't say
> in the ass.  That's the only thing.
>
> **Mercy:** So you didn't say that?
>
> **Peter:** Yeah, I said that, yeah.  But I
> wasn't, I wasn't thinking that.
>
> **Mercy:** No, but what I am saying. .
>
> **Peter:** I was going through mad shit that's
> why, but he said he fucked him.  Not in the
> ass, he wasn't that, ah, specific.

Ex. B (Transcript # 1) to Pet'r's Sept. 20, 2003 Reply to Court's

Order to Show Cause of Sept. 4, 2003 Pertaining to Exhaustion (DE

5); (the above excerpts are found at pages 4, 5 and 7 of

Transcript # 1) .

There is no question that Gonzalez testified before the

grand jury.  But although petitioner insists that Gonzalez's

testimony before that body dovetailed with what appears in his

written statement concerning the subject of sodomy, Gonzalez told

Mercy he actually does not remember what he told the grand jury.

Id. at 22-23.  He does recall, however, that after his grand jury

appearance and before trial that he informed the prosecutor of

the error in his original written statement.  This partial

recantation was not divulged by the People to the defense, thus

triggering petitioner's second Brady complaint.

Initially it is noted that this Brady claim is procedurally barred for the same reasons earlier articulated with respect to its Outlaw-based counterpart. Moreover, the label attached to the purported wrong is incorrect. "Evidence is not 'suppressed' [in the Brady sense] if the defendant either knew, . . . or should have known, . . . of the essential facts permitting him to take advantage of any exculpatory evidence." United States v. LeRoy, 687 F.2d at 618. It is agreed that Gonzalez's modification as to the thrust of what he was told by petitioner on the night of the homicide was initially discovered by the defense prior to Gonzalez testifying at trial. The defense then notified the prosecution. This scenario, does not, ipso facto, implicate Brady and, accordingly, petitioner's second Brady claim, like his first, necessarily fails. See United States v. Zagari, 111 F.3d 307, 320 (2d Cir.) cert. denied, 522 U.S. 983 (1997). ("Brady cannot be violated if the defendant[] had actual knowledge of the relevant information . . . .").

Petitioner, however, views his Brady claim as more nuanced than the identity of the party that discovered the exculpatory information. As Rivera explains:

> Petitioner has repeatedly stated that the Brady violation did not occur[] when defense counsel gave the tape of Peter Gonzalez's statements to the prosecutor. But that the Brady violation occurred when the prosecutor failed to reveal that his witness admitted

-17-

> perjuring himself in the grand jury, and he
> _never revealed this to the court or to_
> _defense counsel_ . . . . [d]espite having
> personal knowledge of the perjury.[9]

Pet'r's Reply & Mem. of Law at 8 (DE 10)(emphasis added).

Petitioner has not explained how the People's purported lapse in divulging Gonzalez's modification of his initial statement to law enforcement likely altered the outcome of his trial or undermined confidence in the jury's verdict. See United States v. Bagley, 473 U.S. 667, 678, 682 (1985). Apparently the thought is that had the information been shared early-on, an effort could have been made to determine whether there was sufficient evidence to permit the felony murder and underlying sodomy count to be pursued at trial. If that exercise resulted in a negative answer, the jury would not have been exposed to, e.g., the following rhetoric during the prosecutor's opening statement:

> And as an ultimate act of indignity, ladies and gentlemen, after this act was done – again, the defendant's own words – after this victim was stabbed, the ultimate degradation, multiple stab wounds, and then sodomizes the victim in this case.

Tr. at 122.

The flaw in petitioner's argument is the talisman

---

[9] In that Gonzalez does not recall, as previously noted in the text, what he told the grand jury concerning the subject portion of his earlier written statement, and given his grand jury testimony has not been furnished to the Court, petitioner's use of the term "perjury" is highly questionable.

significance he has attached to the phrase "in the ass." Seemingly implicit in his argument is the notion that if this verbiage was deleted,[10] the sodomy and felony murder counts would have been necessarily dismissed prior to trial. But it is highly unlikely that would have occurred. Independent of that phrase, the prosecution was prepared to, and did present evidence to the jury that Demetres, while largely incapacitated after being beaten and stabbed, was lying in the parking lot, with his trousers and undershorts pulled down to or below his knees. So whether petitioner told Gonzalez shortly after the attack that "he fucked him" or "fucked him in the ass" is not dispositive of the issue. Either phrase, given the attendant circumstances, would permit the triers-of-fact to conclude that petitioner sodomized the victim.[11] As a result, the prosecutor's reference to the "ultimate act of indignity" in his opening was not beyond the bounds of appropriate advocacy at that stage of the proceeding.[12]

_____

[10] As it was during Gonzalez's testimony at trial. <u>See</u> Tr. at 857-59; 863-64.

[11] Alternatively, the jury could have adopted petitioner's argument that the phrase "fucked him" in street parlance means simply to stab the victim.

[12] The sodomy count was dismissed at the conclusion of the People's case-in-chief in response to defense counsel's motion to dismiss. Tr. at 872-73. The felony murder charge, however, was permitted to go to the jury, <u>id.</u>, which acquitted petitioner of that count. Tr. at 1146.

-19-

To partially reiterate as to petitioner's Gonzalez-based claim, it is procedurally barred. Moreover, it does not implicate Brady. And even if, arguendo, it did, the phrase "fucked him" lent itself to various permissible interpretations including sodomizing the victim, thereby rendering the objected to statement by the prosecutor during his opening fair comment.[13]

3. Lack of Materiality

In addition to the previously discussed fatal inadequacies plaguing both of petitioner's Brady claims, neither the missing Outlaw-testimony nor the prosecution's failure to reveal Gonzalez's modified position vis-a-vis his post-homicide conversation with petitioner meets the materiality standard necessary to justify the relief sought. See Kyles v. Whitley, 514 U.S. 419, 434 (undisclosed evidence is material only if it "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.")

B. INEFFECTIVE ASSISTANCE OF COUNSEL

In seeking habeas relief, petitioner also contends that he was denied effective assistance of counsel at trial.

_____

[13] To the extent petitioner suggests that the tape of the Gonzalez interview by Mercy should have been played for the jury as part of the government's direct case, left unexplained is the rule of evidence which would permit such use or, perhaps more importantly, what purpose would be served by that exercise, remembering that Gonzalez deleted the phrase "in the ass" during his trial testimony.

### 1. Legal Standard

The Sixth Amendment provides that a criminal defendant "shall enjoy the right . . . to have the assistance of Counsel for his defense." U.S. Const. amend. VI.

In order to prevail on a Sixth Amendment claim, a petitioner must prove that

> (a) counsel's representation "fell below an objective standard of reasonableness" measured under "prevailing professional norms," and
>
> (b) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."

Strickland v. Washington, 466 U.S. 668, 688, 694 (1984). A "reasonable probability" is "a probability sufficient to undermine confidence in the outcome." Id. at 694.

There is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id. at 689.

### 2. Listing of Claimed Errors by Counsel

In seeking the vacatur of his conviction due to the performance of his counsel at trial, petitioner maintains:

> a) "Trial Counsel was ineffective when he failed

to utilize[] and reveal to the court the [p]rosecutor's <u>Brady</u>
[v]iolation pertaining to Peter Gonzalez['s] recantation of his
[g]rand [j]ury [t]estimony."  Pet. (DE 1) at 14.;

b)  "Trial Counsel was ineffective in conceding
issues of [p]ayment to Brian Medina."  <u>Id.</u> at 16;

c)  "Trial [C]ounsel was ineffective when he
created a conflict of interest by warning a defense witness of
his pending arrest."  <u>Id.</u> at 17;

d) "Trial Counsel erred when he failed to request
a read back of Eric Outlaw['s] [g]rand [j]ury [t]estimony."  <u>Id.</u>
at 18;

e) "Trial Counsel erred when he failed to request
a missing witness charge against the [P]eople."  <u>Id.</u>;

f)  "Trial Counsel failed to place proper
objections on the record pertaining to the prosecutor's
misconduct during his summation."  <u>Id.</u>; and

g) "Trial Counsel [f]ailed to object to the trial
court['s] [e]rroneous charge to the [j]ury of the [r]eckless
[e]lement in the [d]epraved [m]ind [m]urder and [m]anslaughter
[s]econd [d]egree counts."[14]  <u>Id.</u> at 19.

---

[14]  The indictment did not contain a manslaughter second
degree count, but that crime was charged to the jury as a lesser
included offense under the second count.  Tr. at 1125-26.

3. Purported Failure to Exhaust State Remedies
   Asserted by Respondent

Respondent contends that grounds "b," "d," "e," "f," and "g" were not raised on appeal even though sufficient facts as to each appeared in the trial record thereby permitting direct appellate review.  Having failed to pursue that avenue of redress, the argument continues, habeas corpus review of those five of the seven listed claims are procedurally barred under New York C.P.L. § 440.10(2)(c).  Resp't's Aff. and Mem. of Law (DE 14) at 36.

The cited basis for respondent's procedural bar argument is the August 7, 2003 Nassau County Court decision denying Rivera's § 440.10 motion to vacate his judgment of conviction, in part, because petitioner's claims were not presented to the Appellate Division.  However, a perusal of that two page decision does not provide support for the proposition urged.  The relevant excerpt reads:

> Except for Defendant's claims of an alleged
> Brady violation, ineffective assistance of
> counsel and prosecutorial misconduct, all
> remaining claims are summarily denied (CPL §
> 440.10(2)(c).)  Sufficient facts appear on
> the record to have permitted direct appellate
> review and Defendant unjustifiably failed to
> timely raise such claims before the appellate
> court.  (Emphasis added.)

Aug. 7, 2003 Dec. of Nassau County Court at 1. (Calabrese, J.)(contained in App. Div. Appendix at 128-29).

The five supposedly procedurally barred claims —

currently cited by petitioner as instances of ineffective assistance of counsel — fall within a category of claims explicitedly excluded from the County Court's § 440.10[2][c] Order of Dismissal.  Given the disconnect between the argument advanced and the proffered support for that argument, the exhaustion issue will not be further pursued.  Instead attention will be focused on the substance of each of the alleged shortcomings of trial counsel viewed through the prism of Strickland.

    4.   Discussion of Claimed Errors by Counsel

    a) Non-Use of Tape of Mercy's Interview With
        Gonzalez and Corresponding Brady Violation

The Mercy tape, on the information provided, was inadmissible.[15]  As a result, its non-introduction into evidence did not constitute ineffective assistance.  Nor does it appear that its use to impeach Gonzalez at trial would have been tactically wise, or so competent counsel could have legitimately concluded.  And, as noted earlier, petitioner's Gonzalez-based complaints fail to establish a meaningful claim under Brady.  Moreover, with respect to the prejudice prong of Strickland, as underscored by trial counsel, petitioner was "neither convicted of the sodomy count nor the felony murder count based on the sodomy."  Trial Counsel DiLuzio's Feb. 13, 2003 letter to Rivera,

---

    [15]  See n.13 supra.

unnumbered p. 2, Attached as Ex. E to Pet'r's May 21, 2012 Suppl. Submission in Supp. of Pet. (DE 27).

### b) Concession That Petitioner Paid Brian Medina to Stab Demetres

Petitioner provided two oral statements, one written statement and one video taped statement to the police before counsel entered the picture. In that regard, Rivera and his girlfriend McKenna had voluntarily gone to the police station upon learning that he was a suspect in the Demetres homicide, their apparent purpose being to deflect the focus from him by identifying Medina as to the sole wrongdoer.[16] Ultimately, however, Rivera told Detective Martin Alger ("Alger") of the Nassau County Homicide Squad that – as detailed in one or more of the above referenced statements – he (1) not only witnessed the crime but that he also, earlier in the evening, paid a fellow bar patron, Calvin, ten dollars to punch Demetres to deter his staring, (see Tr. of County Court Suppression Hearing in Sept. 1998 at 83-84); (2) that he hired Medina to "fuck up" Demetres, meaning to "stab him" for "two eight balls of cocaine . . . or two hundred fifty dollars," (id. at 85); (3) that he, Rivera, used a branch, about "four inches . . . in diameter" and the length of "a baseball bat" to strike Demetres "twice" while

---

[16] See Tr. of County Court Suppression Hearing in Sept. 1998 [testimony of Det. Fidel Balan of Freeport Police Dept.] at 64-65.

Medina was stabbing the victim (id. at 93, 94); and (4) that when Medina said "I want my money," he paid him, at least in part, with funds of his that were being held by McKenna (id. at 95).

Petitioner complains that, notwithstanding his numerous admissions about hiring Medina to stab Demetres and paying him for his services, that "conceding [the] issue of payment to Brian Medina" unconstitutionally compromised his right to effective assistance. In doing so, he directs the Court's attention to page 8 of the trial transcript. Pet. at p. 16. Reference to that page, however, is not particularly illuminating. It appears, however, that when page 8 is read in context (see Tr. at 6-15), that defense counsel was endeavoring to reach an agreement with the prosecutor culling several references in petitioner's statements to law enforcement regarding his drug activities before their receipt into evidence. That effort was understandably only partially successful, however, for counsel was required to acknowledge that the quid pro quo for Medina stabbing Demetres, to wit "$250[or] two eight balls," did not lend itself to such paring. Tr. at 8. Simply put, petitioner has failed to establish that defense counsel's post-Miranda hearing,[17] pretrial concession concerning the "issue of payment

---

[17] The County Court judge assigned to the case held a pretrial hearing in September 1998, at the conclusion of which he held that the oral, written and video taped statements Rivera gave to law enforcement were constitutionally obtained and, therefore, would be admissible at trial.

of Brian Medina" (Pet. at p. 16) was, given the attendant circumstances, an instance of ineffective assistance of counsel.

Moreover, and independent of the efforts to sanitize petitioner's incriminating statements, his counsel might well have concluded that contesting this issue in view of the explicit, detailed and repeated admissions by the client would have been foolish and undermined the entire credibility of the defense. See DeLuca v. Lord, 77 F.3d 578, 588 n.3 (2d Cir. 1996)("a lawyer's decision not to pursue a defense does not constitute deficient performance if, as is typically the case, the lawyer has a reasonable justification for the decision); see also DiLuzio's Feb. 13, 2003 Letter to Rivera, p. 2 (DE 27 at p. 23)(in which counsel, responding to an inquiry from his former client, wrote: "How about your videotaped confession? Do you think that might have had anything to do with the position we took at trial? Or how about your testimony before the grand jury? Do you think that might have had anything to do with it? Or how about what you kept telling me over and over again that happened? Maybe, just maybe, in the face of the confession it was the only reasonable position to take"); see generally Mehler, Gleeson & James, Federal Criminal Practice: A Second Circuit Handbook, ¶ 26-6 at p. 496 (14th ed. 2014) ("[t]rial-based ineffectiveness claims, most of which involve questions of trial strategy and tactics, generally fail in the Second Circuit even

though counsel's strategy [, unlike here,] may have been 'risky, unorthodox or downright ill-advised,'" citing <u>Tippins v. Walker</u>, 77 F.3d 682, 686 (2d Cir. 1996)).

### c) Informing Outlaw That Police had a Warrant for his Arrest

Petitioner maintains that trial counsel "was ineffective when he created a conflict of interest by warning a defense witness [viz. Outlaw] of his pending arrest." Pet. at 17. "[By] choosing Eric Outlaw's continued freedom over defendant's interest as a [c]riminal defendant, [trial counsel] went against his duty to defend as his attorney." <u>Id.</u>

It is petitioner's position that had Outlaw been called to the stand he would have testified consistent with his grand jury testimony along the lines that when petitioner reentered the bar after the stabbing he "expressed shock and disbelief that Brian Medina had stabbed Demetres."[18] <u>Id.</u>

DiLuzio, in his February 13, 2003 letter in response to petitioner's ineffective assistance claims, explained his trail strategy thusly:

> It is true that I told Eric Outlaw the police had a warrant for his arrest and were looking for him. . . . He would still have testified, but I told him he didn't have to stay at court if he didn't want. So, he left. There were several reasons I told him that. First, both Thomasina and Heidi were

---

[18] The above synopsis of Outlaw's grand jury testimony is as reported by petitioner.

supposed to comment on your appearance.  So,
                    I thought the jury already heard or would
                    hear it.  Second, I didn't think it would be
                    helpful to get the same testimony from
                    someone who was "wanted" by the police.

DiLuzio Letter of Feb. 13, 2003 to Rivera at 3 (DE 27 at p. 23).

        Both Thomasina McKenna ("McKenna") and Heidi Howes

("Howes") testified at the trial.  McKenna described Rivera's

demeanor right after the stabbing as appearing to be "scared" and

"shook up."  Tr. at 891.  However, that testimony was stricken.

Id.  Howes testified as to the same subject but most of what she

had to say still stands as part of the record.[19]  She described

Rivera as "look[ing] like he had seen a ghost" and as appearing

"stunned."  Id. at 453-54.  In essence, then, what she told the

jury was similar in substance with what petitioner proffers he

had hoped to elicit from Outlaw.

        In sum, DiLuzio's decision not to call Outlaw given his

warrant status cannot be labeled as a constitutional violation,

particularly given counsel's understanding that like evidence

would be presented to the jury via other witnesses unencumbered

by one or more outstanding arrest warrants.

        Petitioner's position also lacks merit as to the second

Strickland prong, i.e. that "there is a reasonable probability

---

        [19]  Howes was asked three questions on cross examination
about Rivera's appearance upon re-entering the bar but only the
last of the three drew an objection which, incidentally, was
sustained.  Tr. at 453-54.

that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland v. Washington, 466 U.S. at 694. As to that prong — assuming Rivera anticipated that Outlaw's testimony would have placed some distance between him and what happened to Demetres — petitioner's girlfriend and roommate McKenna testified that petitioner (1) "gave [Calvin] a beer . . . for smack[ing Demetres]," (Tr. at 919); (2) agreed to pay Medina "[t]wo eight balls . . . or $250," (id. at 935), "to fuck up Michael," (id. 934-35); and (3) right after Medina stabbed Demetres, she, at the direction of petitioner, gave "[o]ne hundred and thirty dollars," to Medina (id. at 933), towards the agreed-upon price for his services.[20]  Id. at 889-90, 892.

> ### d)  Failure to Request a Reading Into Evidence of Outlaw's Grand Jury Testimony

For Outlaw's grand jury testimony to have been placed before the petit jury as petitioner contends should have been done, his unavailability at that time had to be established. See People v. Robinson, 89 N.Y.2d 648 (1977). The mere fact that Deluzio told Outlaw he could leave the Courthouse and that the police had a warrant for his arrest may not be equated – as petitioner has implicitly tried to do — with the type of showing

---

[20]  McKenna testified that petitioner said to her, upon reentering the bar after the stabbing "It's time to go home." Tr. at 928.

that would have been necessary for the receipt into evidence of
his testimony before the grand jury.; which is to say, had
counsel made the request petitioner maintains he should have, it
would, almost certainly, have been denied.

> e)   Failure to Request a Missing Witness
>      Charge as to Outlaw

For a missing witness charge to be given, the proponent
must establish each of the following three preconditions: "First,
the witness's knowledge must be material to the trial.  Second,
the witness must be expected to give non-cumulative testimony
favorable to the party against whom the charge is sought.  This
has been referred to as the 'control' element, which requires the
court to evaluate the relationship between the witness and the
party to whom the witness is expected to be faithful.  Third, the
witness must be available to that party."  IA New York Pattern
Jury Instructions - Civil, 1:75 at 113-14 (3rd ed. 2011).

A juxtaposing of the above preconditions against the
facts at hand demonstrates that petitioner's argument fails as to
the "control" aspect of the second element.  There is nothing to
suggest beyond petitioner's conclusory assertions that Outlaw was
any more under the prosecution's control than his.  Petitioner's
argument as to first precondition is also problematic in that
Outlaw's proffered testimony would have been cumulative of
Howes's actual testimony.  In essence, there was no legal basis
for counsel to request a missing witness charge.

f)  Failure to Object to Portions of
    Prosecutor's Summation

Petitioner asserts that trial counsel was ineffective for failing to object to certain comments made by the prosecutor during his summation citing statements appearing on pages 1030,[21] 1035, 1040, 1065, 1067, 1068 and 1069 of the trail transcript. Pet. at 18-19.  Each of those pages has been read by the Court, along with the surrounding colloquy when required for purposes of completeness.

None of the targeted statements was of such a nature that competent counsel would have necessarily objected to the utterance.  And had counsel objected, the likelihood is that the objection would have overruled as lacking substance.  Thus, the prosecutor's comments at pages 1034 and 1035 about petitioner (1) paying Calvin, and later Medina to assault Demetres, and (2) personally beating him with a tree branch during the stabbing by Miranda are wholly consistent with the evidence adduced including petitioner's admissions to law enforcement and to Gonzalez, as well as the thrust of his girlfriend McKenna's testimony.

The prosecutor's arguments at pages 1039-40 were similarly within the appropriate bounds of trial advocacy. Counsel merely suggested a common sense methodology that the

---

[21]  Presumably should read "1034"; page 1030 of the transcript pertains to defense counsel's summation, not the prosecutor's.

jurors might employ in evaluating the often divergent testimony about such subjects as, e.g., what actually transpired during the questioning of petitioner and McKenna at the police station. Those recommended factors included such standard fare as "look[ing] for things [like] bias, interest [and] motivation to lie," as well as the witness's demeanor while on the stand. Tr. at 1040.

As to petitioner's remaining objection – those being the ones on pages 1065-69 pertaining to Gonzalez's testimony, – special mention is required. Rivera contends that the "Gonzale[z's] statement was used [by the prosecutor during his summation] to support the [s]odomy count. . . . [b]ut, [he] never reveal[ed] that the witness had recanted the statement." Pet. at 19. That statement is misleading as out-of-sync with the record because (1) the "sodomy count" was dismissed at the end of the People's case-in-chief and, thus, the prosecutor's comments during summation did not apply to that count, (2) Gonzalez never recanted the portion of his statement that petitioner told him that the victim's trousers and undershorts were at knee high level at some point during the attack and that both he and Medina "fucked" Demetres, and (3) Gonzalez did not refer to the "in the ass" modifier during his testimony before the jury nor did the prosecutor use that phrase during his summation.

Petitioner has failed to establish that defense

-33-

counsel's silence during the cited portions of the prosecutor's summation constituted ineffective assistance of counsel or somehow compromised his right to a fair trial via "bolstering"[22] otherwise.

### g) Failure to Object to the Court's Charge to the Jury

Petitioner urges that the trial court instructed the jury improperly on the "Reckless Element on the Depraved Mind Murder and Manslaughter Second Degree [C]ounts."[23]  It is his position that "[d]uring the charge to the jury phase of the trial, the trial court made [an] error . . . [w]hen it . . . failed to make a distinction between the level of risk that differentiates the higher charge of Depraved Mind Murder from the lesser included [offense] of Manslaughter Second Degree."  Pet. at 19.  Counsel's failure to object to the claimed error is cited as another instance of ineffectiveness.  As explained by petitioner:

> The court gave its instruction [of the term "recklessly" in a depraved mind murder context under New York Penal Law § 125.25(2)] as follows:
>
> A person acts recklessly when that person engages in conduct which creates a substantial, unjustifiable [**AND**] grave risk that another person's death will occur

---

[22]  Petitioner unconvincing characterizes several of the prosecutor's comments as "bolstering."  <u>See</u> Pet. at 19.

[23]  Pet. at 19.

(emphasis on words added by the court to the
jury instructions). . . .

By commingling and broadening the levels
of risk associated with the Depraved Mind
Murder count, the court took away the jurors'
ability to choose the lesser charge. As it
broadened the Reckless element in the charge
in such a way that it enveloped every charge
in the Penal Law that has reckless as an
element of the offense.

Once the court mixed together the
[Substantial unjustifiable and grave risk]
together[,I]t virtually demanded that the
jurors find guilt on the Depraved Mind
Murder.

Pet. at 20.

The trial court's charge on depraved indifference
murder, (Tr. at 1119-23), was correct. It is consistent with the
recommended instruction found in the New York Pattern Jury
Instructions ("CJI"), as well as with the New York Penal Law
definitions of the crime and of the term "[r]ecklessly"]. See
CJI, 2d Ed., at p. 125-1039 to 125-1043; N.Y. Penal Law §§
125.25(2) and 15.05(3). However, the instruction given on the
lesser included offense of reckless manslaughter under Penal Law
§ 125.15 was flawed in that the judge incorporated by reference
into that portion of his charge the definition of "reckless" he
had provided earlier for the murder count. Tr. at 1126. The
problem is that the term's meaning is not the same for the two
crimes. Compare CJI, 2d Ed. at p. 125-1040("A person acts
RECKLESSLY with respect to another person's death [for purposes

of a depraved indifference charge] when that person . . . .
engages in conduct which creates <u>a substantial, unjustifiable and</u>
<u>grave risk</u> that another person's death will occur . . . ."
(emphasis added) <u>with</u> <u>id.</u> at pp. 125-1019-20("A person acts
RECKLESSLY with respect to a death [for purposes of reckless
manslaughter] when that person engages in conduct which creates
or contributes to <u>a substantial and unjustifiable risk</u> that
another person's death will occur . . . .") (emphasis added).

I think, although it is not entirely clear, that the
erroneous grafting of the term "grave" into the reckless
manslaughter part of the court's instruction is the lynchpin of
Rivera's complaint about his attorney's failure to object.
Although counsel should have objected, there is nothing to
indicate that his failure to do so negativity impacted
petitioner. Indeed, the jury was instructed not to even consider
the reckless manslaughter count unless the People failed to prove
the depraved indifference murder charge. Tr. at 1125-26. And,
of course, that precondition never materialized, thereby
rendering the subject under discussion moot.

Finally, this ineffective assistance claim is
procedurally barred for the same reasons earlier provided vis-a-
vis petitioner's <u>Brady</u> claims. The bar is not based on the
dismissal order rejecting of Rivera's N.Y.C.P.L. § 440.10
application as maintained by respondent, but rather because it

was never presented to the Appellate Division nor raised in the
leave to appeal application filed with the New York Court of
Appeals.

### C. Petitioner's Claim That "Jury's Verdict was Against the Weight of the Evidence"[24]

As "[g]round 3 of his petition, Rivera seeks habeas
relief maintaining that the "[v]erdict was against the weight of
the evidence," referring to Point I of his brief to the Appellate

Division submitted on direct appeal.  Pet. at 6.
However, Point I of that brief contains not only that claim but
also the assertion that "the [e]vidence fails to establish guilt
of depraved indifference murder beyond a reasonable doubt," i.e.
a sufficiency argument.  Def.' Br. to App. Div., Point I at 19
(quoted language is all in upper case in original).  The question
thus arises as to whether petitioner's challenge is confined to
attacking the weight of the evidence or does it also extend to
its sufficiency.[25]  The answer is found in petitioner's
submissions, particularly his Reply.  Therein, he cites four
specific grounds – identified and addressed <u>infra</u> — under the
rubric of "sufficiency" which, in his view, mandate the vacatur
of his conviction for depraved indifference murder.  <u>See</u> Pet'r's

---

[24]  <u>See</u> Pet'r's Reply & Mem. of Law (DE 10) at i.

[25]  The People obviously believe the former as evidenced by
its submission in opposition to this ground which simply
addresses the weight of the evidence argument.

Reply & Mem. of Law at 41.  Accordingly, both arguments will be addressed.  In deference to his pro se status, and without conducting a sua sponte analysis to determine whether one or more of the grounds urged is procedurally barred from consideration, each of his sufficiency arguments will be addressed on the merits, along with his weight of the evidence contention.

Short shift may be made of the "weight of the evidence" claim.  Assessing the weight of the evidence by its very nature involves credibility determinations and endeavoring to resolve conflicts in the evidence.  Such an undertaking is beyond this Court's authority in a § 2254 proceeding.  See Jackson v. Virginia, 443 U.S. 307, 318-19 (1979); see also Young v. Kemp, 760 F.2d 1097, 1105 (11th Cir. 1985)("A federal habeas court has no power to grant habeas corpus relief because it finds that the state conviction is against the 'weight' of the evidence . . . ."); Johnigan v. Elo, 207 F. Supp. 2d 599, 612 (E.D. Mich. 2002)(petitioner's claim that the verdict was against the weight of the evidence does not present a question cognizable in a federal habeas corpus proceeding).  Therefore, this ground of the petition is denied.

However, the Court is empowered to address the second subject  broached in Point I of Rivera's Appellate Division brief, i.e. the sufficiency of the evidence.  Jackson v. Virginia, 443 U.S. at 324 (holding that a federal habeas court

may grant the writ if upon the evidence presented in a state criminal proceeding "no rational trier of fact could have found proof of guilt beyond a reasonable doubt."); see also Young v. Kemp, 760 F.2d at 1105. In doing so, the court "must consider whether , as a matter of federal law, there was sufficient evidence for a jury to find that the prosecution proved the substantive elements of the crime as defined by state law," viewing the evidence in the light most favorable to the prosecution. Einaugler v. Supreme Court of State of N.Y., 109 F.3d 836, 839-40 (2d Cir. 1997).

Rivera maintains that the trial evidence was insufficient to support his conviction for depraved indifference murder because:

1. "[t]here was no direct evidence" that he "offered to pay Medina to stab the victim" and "the killer's confession outright dismissed this theory," Pet'r's Reply & Mem. of Law (DE 10) at 41;

2. "[t]he people argued that payment [was] made when Medina accosted petitioner's girlfriend in the bar and demanded money. This occurred after the stabbing. . . ." id.;

3. in that the People's case was premised on a theory of accomplice liability, the prosecution was required to prove that he harbored the same "mens rea" as Medina, id.; and

4. "if the [P]eople's evidence is to be believe[d] . .

. . . a verdict for intentional murder" should have been returned rather than one based on depraved indifference, <u>id.</u>

Each of these arguments will be discussed in turn.

`      1. Direct Evidence as to Rivera's Contract With Medina
          <u>and Purported Inconsistency With Medina's Confession</u>

The proof that petitioner contracted with Medina to stab Demetres for $250 or an "eight ball" of cocaine is overwhelming given defendant's oral, written and videotaped statements to that effect, supplemented by the testimony of his girlfriend McKenna and his friend Gonzalez as to the statements he made to each of them about the attack. All of those statements constitute – contrary to petitioner's apparent understanding – direct evidence of his guilt. <u>People v. Basir</u>, 179 A.D.2d 662, 663 (2d Dep't 1992), <u>People v. Emery</u>, 159 A.D.2d 992 (4th Dep't 1990), and <u>People v. Jones</u>, 153 A.D.2d 590 (2d Dep't 1989). But even if, contrary to the fact, there was no direct evidence of Rivera's contract with Medina, that would not render the evidence underlying his conviction insufficient. <u>See</u> Mehler, Gleeson and James, <u>Federal Criminal Practice: A Second Circuit Handbook</u>, § 46.4 (14th Ed. 2014) and cases cited therein.

Similarly unavailing to petitioner is whether Medina's confession dovetailed with the prosecution's theory of the case. That question is simply irrelevant in the present context which does not factor into the sufficiency analysis the existence of countervailing evidence in, or outside the trial record.

2. <u>Payment of Quid Pro Quo to Medina</u>

    The facts as to the captioned transaction were discussed earlier.  Unaddressed by petitioner is the significance of the payment being made after the stabbing and none is apparent from the other arguments advanced.

3. <u>Claimed Requirement That People Prove That Rivera had the Same Mens Rea as Medina</u>

    Section 20.00 of the New York Penal Law, entitled "Criminal liability for conduct of another," provides "[w]hen one person engages in conduct which constitutes an offense, another person is criminally liable for such conduct when, acting with the mental culpability required for the commission thereof, he solicits, requests, commands, importunes, or intentionally aids such person to engage in such conduct."  N.Y. Penal Law § 20.00.

    Rivera contends that he cannot be saddled with responsibility for Medina's actions due to each having a different <u>mens</u> <u>rea</u>, Medina's proffered as being "intentional" and his "depraved indifference."  The jury, however, never had the opportunity to determine the nature of the crime committed by Medina or his concomitant mental state since he pled guilty prior to trial.  That plea was to depraved indifference murder, i.e., the same crime of which petitioner stands convicted and now challenges.  Absent a jury finding or admission by Medina that he intended to kill Demetres, petitioner's disparate mental states argument is problematic.  But beyond that, Rivera's position runs

afoul of New York Penal Law Section 20.15 which provides in pertinent part that "when, pursuant to section 20.00, two or more persons are criminally liable for an offense which is divided into degrees, each person is guilty of such degree as is compatible with his own culpable mental state. . . ."  N.Y. Penal Law § 20.15.

Intentional murder under Penal Law § 125.25(1) and depraved indifference murder under § 125.25(2) both constitute [m]urder in the second degree, with the latter simply being a variant of the former.  And manslaughter in the second degree under Section 125.15(1) is a lesser included offense of depraved indifference murder.  All three constitute differing degrees of homicide, each with distinct <u>mens</u> <u>rea</u> requirements.  Accordingly, Rivera is responsible for Medina's behavior under § 20.00 and § 20.15 whether or not they shared the same mind set in attacking the victim.  <u>See</u> <u>Maiorino v. Scully</u>, 746 F. Supp. 331, 336 (S.D.N.Y. 1990)("Justice Torres correctly pointed out in his jury charge that accomplices may be convicted of differing degrees of homicide depending on each one's specific intent," citing, <u>inter alia</u>, New York Penal Law § 20.15).

4. Intentional Murder Versus Depraved Indifference
   Murder and Petitioner's Contention That, "if the
   People's Evidence is to be Believed," the Verdict
   <u>Should Have Been for the Former</u>

Petitioner was convicted on January 6, 1999.  His conviction and sentence were affirmed by the Appellate Division,

Second Department on January 3, 2002, with leave to appeal to New York Court of Appeals being denied on March 29, 2002.  People v. Rivera, 97 N.Y.2d 760 (2002).  His conviction thus became final 90 days later, when his time to file a petition for certiorari expired.  Policano v. Herbert, 7 N.Y.3d 588, 593 (2006).  The law as it existed at that time governs.  Id. at 602-03; see also Flowers v. Fisher, 296 Fed. Appx. 208, 210 (3d Cir. 2008)("We look to New York law as it existed at the time [petitioner's] conviction became final, as the New York Court of Appeals has found that although the law on depraved indifference has changed significantly in recent years, those changes do not apply retroactively.")(citation omitted).

        Beginning with People v. Gonzalez, 1 N.Y.3d 464 (2004), the New York Court of Appeals in a series of decisions "'recast' the law of depraved indifference murder."  Henry v. Ricks, 578 F.3d 134, 138 (3d Cir. 2009).  Now, "contrary to prior interpretations of N.Y. Penal Law § 125.25(2), New York law does not permit a jury to convict a defendant of depraved indifference murder where the evidence demonstrates the defendant's intent to kill the victim."  Henry v. Ricks, 578 F.3d at 138.  However, that recasting of the law — as just noted via the cite to Flowers v. Fisher — is not retroactive.  Indeed, as explained by the Second Circuit in Henry v. Ricks:

        [F]rom 1983 . . . through 2002, . . .
        "recklessness, pure and simple, [was] the

mens rea for depraved indifference murder,
and depraved indifference murder was
distinguishable from manslaughter not by the
required mens rea, but by the objective
circumstances in which the act occurred which
defined the degree of risk created by the
defendant. From 1983 to 2002 the very facts
establishing a risk of death approaching
certainty and thus presenting compelling
circumstantial evidence of intent – for
example, a point blank shooting of a victim
in the head – likewise demonstrated depraved
indifference. In other words, under this
pre-Gonzalez[26] rule, an individual could,
in some cases, be convicted of depraved
indifference murder even where the evidence
suggested that he may have intended to kill
his victim.

578 F.3d at 139 (emphasis added; internal quotation marks and

citations omitted).

Which is to say, at the time Rivera's conviction became

final in June 2002, "'it [was] not a valid challenge to the

conviction for reckless murder [under N.Y. Penal Law § 125.25(2)]

that the evidence tended to establish defendant's guilt of

intentional murder.'" Henry v. Ricks, 578 F3d at 139 (quoting

Policano v. Herbst, 7 N.Y.3d 588, 600 (2006)). Therefore,

Rivera's last sufficiency argument to wit, that his conviction

for depraved indifference murder may not stand because the

evidence suggests the killing was intentional, not reckless –

---

26 The cite for "Gonzalez" is People v. Gonzalez, 1 N.Y. 3d
434 (2004); as explained in People v. Feingold, 7 N.Y.3d 288, 292
(2006), "beginning in 2003, a number of decisions by [the New
York Court of Appeals] pointed the law in a different direction
[i.e. away from the decisional law as it existed "pre-
Gonzalez."].

lacks merit when evaluated under the law in effect, as it must be, at the time his conviction became final.

## D. CLAIM THAT SENTENCE IS EXCESSIVE

The sentence imposed upon petitioner of twenty five years to life does not exceed the statutory range established by the state legislature.  Accordingly, his assertion that the sentencing judge abused his discretion by "treat[ing] him worse than the actual confessed killer,"[27] who received twenty years to life, does not present a cognizable federal issue subject to review by a habeas court.  White v. Keane, 969 F.2d 1381, 1383 ("No federal constitutional is presented where, as here, the sentence is within the range proscribed by state law") and Fielding v. LeFevre, 548 F.2d 1102, 1108 (2d Cir. 1977)("[Fielding] asks this Court to review a sentence handed down by a state court, which we are powerless to do.").

## IV. CONCLUSION

For the foregoing reasons, Rivera's habeas petition is denied.  Additionally, no certificate of appealability will issue because Rivera has failed to make a substantial showing of the denial of a constitutional right as required by U.S.C. § 2253(c)(2).

---

[27]  Pet'r's Reply & Mem. of Law (DE 10) at 43.

The Clerk of the Court shall enter judgment accordingly and close this case.

SO ORDERED.

Dated: February 12, 2015
      Central Islip, New York 11722

_____
DENIS R. HURLEY, U.S.D.J.